SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
Justice Dougherty delivers the Opinion of the Court with respect to Sections I through IV(A) and announces the Judgment of the Court with respect to Sections IV(B) through VI. Justices Baer and Todd join the Opinion in full. Chief Justice Saylor, Justice Donohue, Justice Wecht and Justice Mundy join only Sections I through IV(A) and do not join Sections IV(B) through VI.
OPINION
JUSTICE DOUGHERTY
*318 In these consolidated discretionary cross-appeals we consider whether an autopsy report is testimonial in nature, such that the report's author must appear as a witness subject to cross-examination at a criminal trial for murder when the report is introduced as evidence substantiating the cause of the victim's death. We hold admission of the autopsy report without testimony from its author was error in this case, but the error was harmless, and therefore affirm.
I. Background
On December 9, 2012, appellant/cross-appellee Darnell Brown attended a party on the 2600 block of Stanley Street in Philadelphia, after hiding a revolver in the wheel well of a nearby parked automobile. At the party, Brown began arguing with Cory Morton (the victim). Marcus Stokes (co-defendant) retrieved the revolver and handed it to Brown, who fired four shots into the victim, killing him. Dr. Marlon Osbourne of the Philadelphia Medical Examiner's Office performed an autopsy of the victim and prepared a report of his findings. The report detailed, among other things, the existence of four gunshot wounds, both penetrating and perforating, that struck the ribs, heart, left lung and left shoulder of the victim. The report noted three of the bullets entered the front of the victim's body while one entered his back and the report described the paths of the bullets.[1] The report noted there was no soot, stippling or muzzle imprints around any of the gunshot wounds. The report concluded the cause of death was multiple gunshot wounds and the manner of death was homicide.
At the time of trial, Dr. Osbourne was no longer employed by the Medical Examiner's Office and he was not called as a witness, but his report of the victim's autopsy was admitted into evidence. The Commonwealth called Dr. Albert Chu of the Philadelphia Medical Examiner's Office, who had not been present *319 at the autopsy, to provide expert testimony based on portions of the autopsy report as well as autopsy photographs. Counsel for both defendants objected to the admission of the autopsy report and Dr. Chu's testimony, apparently on the basis of Bullcoming v. New Mexico , 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011),[2] arguing the report constituted testimonial evidence, and its admission through Dr. Chu violated the Confrontation Clause of the Sixth Amendment of the United States Constitution.[3] The trial court overruled the objection.
Dr. Chu explained to the jury the difference between penetrating and perforating gunshot wounds and the distance parameters of gun barrel to body for gunshot wounds that leave no stippling, soot or other residue marks. Although Dr. Chu could not state the order in which the wounds were received, he testified, based on the victim's injuries as detailed in the report, death would have been rapid but not instantaneous. Dr. Chu testified the wounds were consistent with a scenario in which someone shot the victim from a distance of six to eight feet while facing him, and then shot the victim in the back after the victim turned away. He further testified the victim could have walked a few feet before collapsing. Dr. Chu testified, in his expert opinion, the cause of death was multiple gunshot wounds and the manner of death was homicide. He testified he was not "merely repeating Dr. Osbourne's *320 opinion from the report[,]" but that he, through his medical experience and training "also h[e]ld this opinion" regarding the manner and cause of death within a reasonable degree of medical and scientific certainty. N.T., 11/5/14, at 130.
The jury convicted Brown of third-degree murder and related offenses, and the court sentenced him to an aggregate term of twenty-five to fifty years' imprisonment. Brown appealed, arguing the trial court erred by permitting Dr. Chu to testify about the victim's cause and manner of death based on Dr. Osbourne's autopsy report.
The Superior Court affirmed Brown's judgment of sentence. Commonwealth v. Brown , 139 A.3d 208 (Pa. Super. 2016). However, the court first determined the trial court erred in allowing admission of the autopsy report in the absence of Dr. Osbourne's testimony:
[W]e hold that an autopsy report that is prepared because of a sudden, violent, or suspicious death or a death that is the result of other than natural causes, is testimonial. Such an autopsy report is prepared to prove a fact, i.e. , the victim's cause and manner of death, that an objective observer would reasonably believe could later be used in a criminal prosecution. As such[,] autopsy reports are testimonial and the author of the autopsy report is required to testify at trial in order to satisfy the Confrontation Clause. In this case, Dr. Osbourne did not testify and [Brown] did not have a chance to cross-examine him prior to trial. Accordingly, [Brown's] Confrontation Clause rights were violated by the admission of the autopsy report in this case.
139 A.3d at 216-17 (footnote omitted). The court also concluded that some of Dr. Chu's testimony was "similar in nature to the surrogate testimony that the Court rejected in Bullcoming " and the admission of those portions of Dr. Chu's testimony "outlining the conclusions Dr. Osbourne drew as a result of the autopsy ... [and] which relayed Dr. Osbourne's opinions regarding the cause and manner of [the victim's] death violated the Confrontation Clause." Id. at 219 n.20. Nevertheless, the panel concluded any error was harmless because "[t]his is not a case where the cause of death was seriously at issue." Id. at 220. Moreover, the court opined Dr. Chu's testimony which offered independent conclusions that were based in part on otherwise inadmissible facts or data was proper under Pennsylvania law, including under Pennsylvania Rule of Evidence 703.[4] Id. at 218-19.
This Court granted the petitions for allowance of appeal filed by both the Commonwealth and Brown.[5]
*321 II. Arguments
A. Commonwealth's Appeal
The Commonwealth contends Brown's rights under the Confrontation Clause were not implicated by the admission of the autopsy report and Dr. Chu's testimony. The Commonwealth acknowledges the Confrontation Clause guarantees the opportunity to confront those who testify against a defendant. In the Commonwealth's view, however, autopsy reports are non-testimonial in nature and thus are " 'exempted ... from Confrontation Clause scrutiny altogether.' " Commonwealth's Brief at 16, quoting Crawford v. Washington , 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (ellipsis supplied by Commonwealth). The Commonwealth argues that, under the United States Supreme Court's decisions in Melendez-Diaz v. Massachusetts , 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), and Bullcoming , both of which were relied upon by this Court in Commonwealth v. Yohe , 621 Pa. 527, 79 A.3d 520 (2013), the test for whether a forensic report is testimonial is the "primary purpose" test, which examines whether the report "was created 'under circumstances which would lead an objective witness reasonably to believe that the [report] would be available for use at a later trial, and was plainly created for [an evidentiary] purpose.' " Commonwealth's Brief at 20, quoting Yohe , 79 A.3d at 537 (emphasis deleted).
The Commonwealth argues that most autopsies in Pennsylvania are not plainly created for evidentiary availability at a later trial, and thus the Superior Court improperly determined the primary purpose test was satisfied. The Commonwealth supports its position by referencing provisions in the County Code, 16 P.S. § 1237(a)(1)-(11), and Vital Statistics Law, 35 P.S. § 450.503, which require coroners to produce autopsy reports for statistical and other purposes independent of any criminal investigation.[6] The Commonwealth argues "[t]he statutory, statistical, and scientific reasons for creating autopsy reports make them substantially different from the [certificates of] narcotics analyses in Melendez-Diaz and the BAC reports in Bullcoming and Yohe ." Commonwealth's Brief at 26. The Commonwealth asserts narcotics analyses certificates and BAC reports are created "for one reason-use in a criminal prosecution[,]" and thus are more properly categorized as testimonial. Id. Because autopsy reports are created for many different reasons, and are not primarily created for use in a criminal prosecution, autopsy reports "are not testimonial under the primary purpose test" and thus do not implicate Confrontation Clause concerns. Id. at 27.
The Commonwealth additionally contends autopsy reports "are not testimonial under the more narrowly-focused test used by the Williams plurality" which "limited the scope of testimonial forensic documents to those that are 'made for the purpose[ ] of proving [the] guilt[ of] a particular criminal defendant at trial' under circumstances in which the authors of the document would know that their contents would be 'incriminating.' " Id. , quoting Williams v. Illinois , 567 U.S. 50, 84, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (Alito, J., *322 Opinion Announcing the Judgment of the Court) (emphasis supplied by Commonwealth).[7] In addition, the Commonwealth notes that thirteen states as well as the First and Second Circuit Courts of Appeal have concluded autopsy reports are not testimonial because they are not created solely for an evidentiary purpose. See id. at 30-31 and n.3 (citations omitted).
Brown responds an autopsy report is testimonial, and thus subject to Sixth Amendment protections, because Pennsylvania law requires an autopsy report in any case of sudden, violent, or suspicious death, as occurred here. Brown's Brief at 13, citing 35 P.S. § 450.503 ("The local registrar ... or other person having knowledge of the death ... shall refer to the coroner the following cases: ... (3) where the circumstances suggest that the death was sudden or violent or suspicious in nature or was the result of other than natural causes[.]"). The purpose of such a report, Brown asserts, is to set forth whether sufficient reason exists for the examiner conducting the autopsy to conclude a sudden, violent or suspicious death was the result of a criminal act. Id. , citing 16 P.S. § 1237(b) ("The purpose of the investigation shall be to determine the cause of any such death and to determine whether there is sufficient reason for the coroner to believe that any such death may have resulted from criminal acts or criminal neglect of persons other than the deceased."). Moreover, Brown notes Pennsylvania law requires cooperation between the coroner and the prosecutor. Id. , citing 16 P.S. § 1242 ("the coroner shall, so much as may be practicable, consult and advise with the district attorney").
Brown maintains an autopsy report falls squarely within that category of forensic reports functionally identical to live in-court testimony subject to cross-examination under Melendez-Diaz . Brown also contends that even if some autopsy reports are generated for other purposes, the autopsy report in this case was clearly generated for the primary purpose of gathering evidence in the investigation of a sudden, violent and suspicious death by other than natural causes. The gravamen of Brown's argument is any autopsy report thus generated is presumptively testimonial because, among other things, it is "made under circumstances which would lead an objective witness reasonably to believe that the [report] would be available for use at a later trial[,]" and the report " 'was plainly created for an evidentiary purpose.' " Brown's Brief at 14, quoting Yohe , 79 A.3d at 537 (internal quotations and citation omitted).
B. Brown's Appeal
Brown presents two issues. First, he claims that because an autopsy report is testimonial, "the introduction of such a report at trial may occur only when the testifying witness is the person who prepared the report, observed the examination from which the report arose, or actively supervised its preparation and completion and is subject to cross-examination." Brown's Brief at 15, citing Yohe , 79 A.3d at 539. Therefore, according to Brown, "[w]here the person testifying neither authored the report nor participated in or supervised the examination and the author is not produced at trial for cross-examination, use of the autopsy report violates the Sixth Amendment." Id. at 12-13, citing Melendez-Diaz, 557 U.S. at 310-311, 129 S.Ct. 2527. Brown argues the constitutional analysis of a testimonial report is no different "when an expert reads the report and makes it *323 the basis for her/his 'new' conclusion." Id. at 16. Brown claims the "factual description of the body's condition and the results of the examination [contained in the autopsy report] neither require nor permit any independent analysis or application of expertise[,]" id. at 17, and where a surrogate medical examiner merely "parrots" the findings of the examiner who conducted the autopsy, such "parroting" violates the Confrontation Clause. Id. at 17-18, quoting State v. Bass , 224 N.J. 285, 132 A.3d 1207, 1226-27 (2016). "In sum, whether the in-court expert repeats another expert's testimonial report or adopts it into his/her own verbiage by making it the basis of the conclusions relayed in the courtroom, the result is the same-a violation of the Sixth Amendment right of Confrontation. Id. at 18, citing Bullcoming generally ; Bass , supra ; State v. Smith , 367 P.3d 420, 432 (N.M. 2016).
Second, Brown claims Pennsylvania Rule of Evidence 703 does not permit an expert to offer an opinion based upon "testimonial hearsay." Brown's Brief at 18. Brown concedes under the Rule "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they [the facts or data] need not be admissible for the opinion to be admitted." Id. at 18-19, quoting Pa.R.E. 703. Nevertheless, Brown argues, " 'the underlying information is not admissible for its truth or substance, but only to inform the jury of the foundation for the opinion.' " Id. at 18-19, quoting 1-703 Ohlbaum on the Pennsylvania Rules of Evidence § 03.07 (2016). Relying on various federal decisions interpreting Federal Rule of Evidence 703 and academic commentary, Brown asserts that "[w]here that [underlying] inadmissible information is testimonial hearsay, however, [ Rule] 703 must bow to the right of Confrontation[.]" Id. at 19, 20-21, citing United States v. Rios , 830 F.3d 403 (6th Cir. 2016) ; United States v. Garcia , 793 F.3d 1194 (10th Cir. 2015) ; Mike's Train House, Inc. v. Lionel, LLC , 472 F.3d 398 (6th Cir. 2006).[8] Finally, Brown insists this issue was "directly" before the United States Supreme Court in Williams , and asserts "[a]t least five of the nine Justices agreed that [F.R.E.] 703 does not permit expert testimony based on testimonial hearsay where it has relevance only if true." Brown's Brief at 21.
The Commonwealth responds that "expert opinion testimony based on information provided by persons not in court has never been held to violate the Confrontation Clause." Commonwealth's Brief at 33, citing Commonwealth v. Baumhammers , 599 Pa. 1, 960 A.2d 59, 95 n.28 (2008). The Commonwealth further asserts decisions of this Court have upheld the precise evidentiary practice that occurred here, claiming *324 Pennsylvania law holds "[a]n expert witness 'who did not perform an autopsy may testify as to cause of death as long as the testifying expert is qualified and sufficiently informed.' " Id. , quoting Commonwealth v. Ali , 608 Pa. 71, 10 A.3d 282, 306 (2010) (citing Commonwealth v. Mitchell , 391 Pa.Super. 100, 570 A.2d 532 (1990) (in homicide cases, testifying pathologists may base their opinions on facts contained in autopsy reports authored by others) ). The Commonwealth additionally notes the High Court's OAJC in Williams states it has " 'long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks [ ] first-hand knowledge of those facts.' " Id. at 36, quoting Williams , 567 U.S. at 67, 132 S.Ct. 2221. According to the Commonwealth, because Dr. Chu's expert testimony was based on otherwise inadmissible facts upon which he relied to reach his independent conclusions, his expert opinion testimony did not offend the Confrontation Clause. With respect to Brown's arguments relying on Rule 703, the Commonwealth posits the issue is waived because Brown never relied on Rule 703 as a basis for his objection to Dr. Osbourne's report or the testimony of Dr. Chu, and in any event, the prosecution was required under Pennsylvania evidentiary rules to present the evidence upon which Dr. Chu's opinion was based. Id. at 39-43. As to the portion of Dr. Chu's testimony that referenced Dr. Osbourne's conclusions or opinions, the Commonwealth asserts any "passing reference to Dr. Osbourne's cumulative opinion about cause and manner of death and the admission of his autopsy report into evidence was at most harmless error."Id. at 37.
III. Confrontation Clause and Testimonial Evidence
Whether the admission and use of the autopsy report in this case-without accompanying testimony from its author-violated Brown's rights under the Confrontation Clause is a question of law, for which our standard of review is de novo and our scope of review is plenary. See Yohe , 79 A.3d at 530. Prior to Crawford , the United States Supreme Court was of the view the Confrontation Clause did not bar the admission of out-of-court statements that fell within a firmly rooted exception to the hearsay rule or that bore a particularized guarantee of trustworthiness. Crawford , 541 U.S. at 40, 124 S.Ct. 1354, citing Ohio v. Roberts , 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (Confrontation Clause does not bar admission of unavailable witness's statement against criminal defendant if statement bears adequate indicia of reliability-to meet adequate indicia of reliability test, evidence must either fall within a firmly rooted hearsay exception or bear particularized guarantee of trustworthiness).
In Crawford , however, the Court sought to align its Confrontation Clause analysis with the original intent of the framers who, according to the Court, were concerned about abuses of the civil-law mode of criminal procedure; in particular, the Court referenced the introduction into evidence of ex parte examinations such as the confession of Sir Walter Raleigh's alleged accomplice in Raleigh's trial for treason. Crawford , 541 U.S. at 50, 124 S.Ct. 1354. The Crawford Court determined the historical record supported the proposition the framers would not have permitted the admission of testimonial statements of a witness who did not appear at trial, and held that such statements could be admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Id. at 59, 124 S.Ct. 1354. Ultimately, the Crawford Court held the playing of a tape-recorded *325 statement at trial, in which the criminal defendant's wife who did not testify on the grounds of marital privilege described to police the circumstances of the defendant's stabbing a victim, violated the defendant's Sixth Amendment right to confrontation.
Subsequent to Crawford , the Court held statements to police are "testimonial," and thus subject to Confrontation Clause restraints, when their "primary purpose" is to establish or prove past events for purposes of proof at a criminal trial:
Without attempting to produce an exhaustive classification of all conceivable statements-or even all conceivable statements in response to police interrogation-as either testimonial or nontestimonial, it suffices to ... hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis v. Washington , 547 U.S. at 822, 126 S.Ct. 2266.
After Davis , the High Court considered a number of cases in which the challenged statements or affidavits took the form of scientific or forensic reports or certificates. In Melendez-Diaz , the Court considered a Massachusetts trial court's admission into evidence at a criminal trial for drug trafficking of certificates reporting the forensic analysis of the composition and quantity of substances seized from the defendant. 557 U.S. 305, 129 S.Ct. 2527. As required by Massachusetts law, the certificates were sworn to before a notary public and were offered into evidence at trial as prima facie evidence the substance seized was a specific quantity of cocaine. Id. at 308, 129 S.Ct. 2527. The defendant objected on the basis of Crawford , claiming the analyst who prepared the certificates was required to testify if the certificates were to be admitted into evidence. The objection was overruled, the defendant was convicted of cocaine distribution and his conviction was upheld on appeal. The High Court granted certiorari to determine whether the defendant's Sixth Amendment rights had been violated.
The Court held "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,' " and thus were "testimonial" in nature. Id. at 310-11, 129 S.Ct. 2527, quoting Davis , 547 U.S. at 830, 126 S.Ct. 2266. Moreover, the Court held admission of the certificates of analysis without the author's live testimony violated the Confrontation Clause because the certificates fell into the "core class of testimonial statements" identified in Crawford . Melendez-Diaz , 557 U.S. at 310, 129 S.Ct. 2527. Significantly, the certificates of analysis were " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' " and under Massachusetts law, the "sole purpose" of the certificates was to provide evidence about the composition and quantity of the analyzed substance. Id. at 311, 129 S.Ct. 2527, quoting Crawford , 541 U.S. at 52, 124 S.Ct. 1354.
The Court rejected the state's argument the certificates were admissible without supporting testimony because they simply reflected "the resul[t] of neutral, scientific testing"; the Court held this argument was "little more than an invitation to return to our overruled decision in Roberts , ...
*326 which held that evidence with 'particularized guarantees of trustworthiness' was admissible notwithstanding the Confrontation Clause." Melendez-Diaz , 557 U.S. at 317, 129 S.Ct. 2527, quoting Ohio v. Roberts , 448 U.S. at 66, 100 S.Ct. 2531. The Court reiterated, "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination...." Id. , quoting Crawford , 541 U.S. at 61-62, 124 S.Ct. 1354.
In Bullcoming , decided two years after Melendez-Diaz , the High Court reviewed the admissibility of a BAC report authored and signed by a non-testifying analyst. The report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author, namely, that the defendant had a BAC level of 0.21, which was the central question at the defendant's trial, and was dispositive of his guilt. The report was introduced through the testimony of a surrogate analyst. The New Mexico Supreme Court held the surrogate's testimony was adequate to satisfy the requirements of the Confrontation Clause. The issue before the High Court was "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification-made for the purpose of proving a particular fact-through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming, 564 U.S. at 652, 131 S.Ct. 2705. The High Court ruled the Confrontation Clause precludes such practice, holding "the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 662, 131 S.Ct. 2705.
New Mexico argued the "affirmations" of the surrogate analyst were nontestimonial because they were not "adversarial" or "inquisitorial" but simply observations of an independent scientist made according to a non-adversarial public duty, and thus, the Confrontation Clause was not implicated. Id. at 664, 131 S.Ct. 2705. The Court summarily noted it is inescapable " Melendez-Diaz le[aves] no room for that argument[.]" Id. at 663, 131 S.Ct. 2705. In concurrence, Justice Sotomayor, who provided the fifth vote for the majority decision to hold Bullcoming's Sixth Amendment rights were violated, wrote separately to highlight 1) why she viewed the BAC report at issue to be "testimonial-specifically because its 'primary purpose' is evidentiary," and 2) "to emphasize the limited reach of the Court's opinion." Id. at 668, 131 S.Ct. 2705 (Sotomayor, J. concurring). Justice Sotomayor noted the BAC report had a primary purpose of creating an out-of-court substitute for trial testimony and opined the formality of the BAC report "further suggests its evidentiary purpose." Id. at 670, 131 S.Ct. 2705 (Sotomayor, J. concurring), citing Michigan v. Bryant , 562 U.S. 344, 366, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) (formality/informality can shed light on whether particular statement has primary purpose of use at trial). Noting Bullcoming was materially indistinguishable from the facts considered in Melendez-Diaz, Justice Sotomayor then highlighted "some of the factual circumstances that this case does not present." Id. at 672, 131 S.Ct. 2705 (emphasis in original). Among other things, Justice Sotomayor explained Bullcoming was not a case "in which an expert witness was asked for his independent opinion about underlying testimonial *327 reports that were not themselves admitted into evidence." Id. at 673, 131 S.Ct. 2705, citing F.R.E. 703 (facts or data of a type upon which experts in the field would reasonably rely in forming an opinion need not be admissible in order for expert's opinion based on the facts and data to be admitted).
Shortly after Bullcoming , the High Court decided Williams v. Illinois , supra , a divided opinion in which the Court sought to further refine its articulation of the primary purpose test under the alternate factual scenario envisioned only hypothetically in Bullcoming by Justice Sotomayor. Williams involved a rape prosecution in which an expert testified she obtained a DNA profile report from an independent lab based on a semen specimen taken from a vaginal swab of the victim. The lab report was not introduced into evidence. The expert testified she compared the DNA profile contained in the lab report to the defendant's recorded DNA profile and concluded it was a match. The defendant challenged the expert's testimony which relied upon the lab report on the basis the report's admission without testimony from its author violated the Confrontation Clause.
The plurality opinion, authored by Justice Alito, joined by Chief Justice Roberts, Justice Kennedy and Justice Breyer, relied in part on F.R.E. 703 and held, "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." Williams , 567 U.S. at 58, 132 S.Ct. 2221. Alternatively, the plurality applied the primary purpose test to conclude the underlying lab report was itself non-testimonial, and thus beyond the reach of the Confrontation Clause, because the report did not identify the defendant, was not inherently inculpatory, and was created "before any suspect was identified." Id. The plurality opined the "report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach." Id. The report "was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." Id. The plurality thus opined the lab report differed from the certificates of analysis and BAC reports in Melendez-Diaz and Bullcoming , which were created for the sole purpose of providing evidence against a particular defendant and were used to establish the truth of the matter asserted. The plurality concluded the defendant's Sixth Amendment confrontation right was not violated and explained:
This conclusion is entirely consistent with Bullcoming and Melendez-Diaz . In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in Bullcoming that the defendant's blood alcohol level exceeded the legal limit and in Melendez-Diaz that the substance in question contained cocaine. Nothing comparable happened here.
Id. at 79, 132 S.Ct. 2221.[9]
In a dissenting opinion, Justice Kagan, joined by Justice Scalia, Justice Ginsberg *328 and Justice Sotomayor, maintained "[u]nder our Confrontation Clause precedents, this is an open-and-shut case." Williams , 567 U.S. at 119, 132 S.Ct. 2221 (Kagan, J. dissenting). Citing Crawford , Melendez-Diaz and Bullcoming , the dissent maintained the independent lab analyst who prepared the DNA profile report, to which the defendant's DNA sample was compared, was a witness against the defendant whom the defendant had a right to confront. The dissent offered " '[o]ur precedent[s] cannot sensibly be read any other way.' " Id. at 125, 132 S.Ct. 2221, quoting Bullcoming , 564 U.S. at 663, 131 S.Ct. 2705.
Turning to our own jurisprudence, this Court addressed whether the admission of a toxicology report in a DUI case violated the defendant's rights under the Confrontation Clause in Yohe . The defendant's blood sample was tested three times by several analysts from one lab using two different methods, as per routine lab practice. Dr. Blum, a toxicologist, and the assistant lab director responsible for the lab's quality assurance controls, received the raw data from the analysts who performed the tests, reviewed the demographic information, verified the appropriate tests were conducted, evaluated the chain of custody, and compared the individual test results to arrive at a BAC result which he set forth in a toxicology report summarizing the test results. Yohe , 79 A.3d at 523-24. Dr. Blum signed the report electronically, certifying its content and his own participatory role in reviewing the data and ensuring its accuracy. Id. at 524. At Yohe's trial, the report showing his BAC to be .159 was admitted into evidence through Dr. Blum's expert testimony. Yohe objected to the admission of the report and to Dr. Blum's testimony on the basis they violated his right to confrontation because the specific lab technicians who actually performed the tests did not testify. The objections were overruled, and Yohe was convicted of DUI and sentenced. On post-sentence motions, however, the trial court held the toxicology report was a testimonial statement requiring production at trial of the analysts who actually performed the underlying tests so that the defendant could confront them. Id. at 525-26. The Commonwealth appealed to the Superior Court, arguing Dr. Blum was in fact the analyst who derived the actual BAC result from his comparison of the readings of the underlying tests conducted under differing methods. The Superior Court agreed Dr. Blum (rather than the original lab technicians) was the witness the defendant had a right to confront, and reversed the grant of a new trial.
On appeal, this Court analyzed the relevant precedent from the High Court, viewing "with caution" the "fragmented" decision in Williams where there was no single rationale to explain the result which garnered a majority. 79 A.3d at 536. This Court noted the narrowest ground for the decision in Williams was the conclusion that the DNA profile report from the independent lab was not testimonial. However, four Justices disagreed with that conclusion and the remaining Justices could not agree about why the report was not testimonial. Thus, this Court considered whether Dr. Blum's toxicology report was testimonial by comparing it to "the facts of the testimonial statements considered in Melendez-Diaz and Bullcoming [,]" id. at 537, and easily concluded the toxicology report was testimonial. Id. The Court then considered whether Dr. Blum was the appropriate analyst to appear at trial for purposes of protecting Yohe's *329 rights under the Confrontation Clause. The Court noted Dr. Blum had extensive supervisory involvement in utilizing the information supplied by his subordinates and highlighted his unique role as the only individual who engaged in the critical comparative analysis of the results of the various tests performed to determine the defendant's actual BAC. Id. at 540. The Court surmised the facts distinguished the case from Bullcoming where the surrogate witness had no opinion concerning the defendant's BAC, "[r]ather the testifying witness merely read the analyst's report into evidence and offered no independent opinion about the defendant's blood alcohol levels." Id. at 541, citing Bullcoming , 564 U.S. at 662, 131 S.Ct. 2705. Thus, the Yohe Court determined the defendant's rights under the Confrontation Clause were not violated because the "author" of the toxicology report was the analyst who testified at trial and was available for cross-examination. Id.
IV. Autopsy Report and Harmless Error
A.
We now consider whether the challenged autopsy report-presented without accompanying testimony by its author Dr. Osbourne-was testimonial in nature such that Brown's Sixth Amendment right to confront the witnesses against him was violated by its admission at trial. We recognize cases from a number of jurisdictions hold autopsy reports are non-testimonial because they are not created primarily for presentation in a criminal trial and thus, the admission of the report without the supporting testimony of its author in criminal trials does not raise Confrontation Clause concerns. Pennsylvania law requires the preparation of autopsy reports in all cases of sudden, violent, and suspicious deaths, or deaths by other than natural causes, and in such cases, the autopsy and subsequent report are designed to determine whether the death occurred as the result of a criminal act. See 35 P.S. § 450.503 ; see also 16 P.S. § 1237. Moreover, the law requires the coroner or medical examiner charged with conducting and reporting the results of such autopsies to consult and advise the local district attorney to the extent practicable. See 16 P.S. § 1242. Accordingly, we determine the primary purpose for preparation of an autopsy report under these circumstances is to establish or prove past events potentially relevant to a later criminal prosecution and that any person creating the report would reasonably believe it would be available for use at a later criminal trial. Thus, we conclude the autopsy report in this case was testimonial.[10] See Crawford, supra ; Melendez-Diaz , supra ; Bullcoming , supra ; Yohe , supra .
Because the autopsy report prepared by Dr. Osbourne was testimonial in nature, under the Crawford , Melendez-Diaz , Bullcoming and Yohe precedents, the report could properly be introduced into evidence without Dr. Osbourne's accompanying testimony only if Dr. Osbourne was unavailable and Brown "had a prior opportunity to cross-examine" him. Crawford , 541 U.S. at 59, 124 S.Ct. 1354. There is no dispute Brown had no prior opportunity to cross-examine Dr. Osbourne. Accordingly, we determine the admission of Dr. Osbourne's report into evidence at Brown's trial was error.
*330 B.
We now consider the Commonwealth's argument the error was harmless. This Court has long held "[w]here a trial error violates the federal constitution, this Court, at a minimum, must employ the federal harmless error rule." Commonwealth v. Story , 476 Pa. 391, 383 A.2d 155, 162 (1978), citing Chapman v. California , 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). A constitutional error cannot be found harmless unless an appellate court is convinced beyond a reasonable doubt that the error was harmless. Id. However, "[i]f there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless." Commonwealth v. Mitchell , 576 Pa. 258, 839 A.2d 202, 214 (2003). The Commonwealth bears the burden of establishing harmlessness beyond a reasonable doubt. Id. at 215. This Court will find harmless error where:
(1) the error did not prejudice the defendant or the prejudice was de minimis ;
(2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
(3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.
Commonwealth v. Young , 561 Pa. 34, 748 A.2d 166, 193 (1999) (citation omitted).
Here, the Superior Court concluded the error was harmless without specifically engaging in the analysis described in Young . Instead, the court held the error was harmless simply because there was no "serious" dispute regarding the victim's cause of death. Brown , 139 A.3d at 220 (admission of report harmless error because the victim was shot several times in chest, cause of death was not "seriously at issue[,]" and "extensive expert testimony was not necessary under the specific facts of this case"). Nevertheless, our own application of the Young test reveals that admission of the autopsy report in this case was harmless error. Specifically, as will be more thoroughly explained infra , we conclude the erroneously admitted autopsy report was merely cumulative of Dr. Chu's independent opinion regarding the cause of death which was properly admissible.
V. Dr. Chu's Testimony
Dr. Chu was accepted at trial as an expert forensic pathologist upon stipulation of the parties and following voir dire of his qualifications before the jury. The jury was informed Dr. Chu had performed thousands of autopsies, but had no role in the autopsy of the victim in this matter other than his review of the autopsy photographs and the autopsy report prepared by Dr. Osbourne. Dr. Chu testified that he relied upon both the descriptions of the wounds in the report as well as the autopsy photographs in reaching his independent opinion regarding the cause of death. Dr. Chu testified he concluded "[b]etween reviewing the photographs and the report" the victim sustained four gunshot wounds. N.T. 11/5/14, at 123. Moreover, Dr. Chu used an exhibit at trial to show the jury where the bullets entered the victim's body. Id. at 124.
We recognize that in Bullcoming , the High Court unquestionably held the right to confrontation is violated when the analyst who writes a report is not made available for cross-examination even if the report is wholly reliable. Bullcoming , 564 U.S. at 661, 131 S.Ct. 2705, citing Melendez-Diaz , 557 U.S. at 319, 129 S.Ct. 2527. The testimony of a surrogate analyst is insufficient to vindicate the right to confrontation *331 in such circumstances because cross-examination of the surrogate cannot expose any lapses or infirmities in the testing process or protocol employed by the analyst who authored the report. Id. at 662, 131 S.Ct. 2705. Significantly, for purposes of our present analysis, the Bullcoming Court noted no argument was presented in that case that the surrogate analyst had "any 'independent opinion' concerning Bullcoming's BAC." Id. Here, Dr. Chu testified his opinion four gunshot wounds caused the victim's death was his own independent opinion.
Additionally, unlike Bullcoming , this is not a case where a surrogate witness simply read a testimonial report authored by another into the record. In addition to the autopsy report, Dr. Chu also examined autopsy photographs to support his own independent opinion as to the cause of death. Brown concedes the photographs were admissible evidence upon which Dr. Chu could properly rely to inform his opinion. Brown's Brief at 17 n.8. There is no Confrontation Clause concern over the opinions Dr. Chu expressed based on his own review of the autopsy photographs because the photos were not testimonial statements of an unavailable witness. Thus, Dr. Chu, a medical examiner with many years' experience, reached an independent opinion regarding the cause of death in part by examining data other than Dr. Osbourne's autopsy report.[11] Nevertheless, it is clear Dr. Chu relied, in part, on the facts contained in the report, such as the number and location of the bullet wounds and their trajectories through the victim's body as well as the report's descriptions of the internal damage caused by the projectiles to offer his independent conclusion regarding the cause of death and to state whether the wounds were consistent with the particular factual scenarios this case presented.[12]
The autopsy report itself was inadmissible absent Dr. Osbourne's testimony. However, had the autopsy report not been introduced into evidence at trial, Pa.R.E. 703 and 705 would arguably permit precisely the type of expert opinion testimony given by Dr. Chu, which was based in part on the otherwise inadmissible facts and data contained in the report upon which experts in the field of forensic pathology would reasonably rely in forming an opinion.
*332 Pa.R.E. 703 ; see also Ali , 10 A.3d at 306 ("[A] medical expert who did not perform the autopsy may testify as to cause of death as long as the testifying expert is qualified and sufficiently informed[.]") (citation omitted). In any event, we decline to decide Brown's Rule 703 -based claims challenging the admissibility of Dr. Chu's testimony because, as the Commonwealth correctly points out, Brown never relied on Rule 703 as a basis for his objections to Dr. Chu's testimony or to the admissibility of the autopsy report at trial, and because discussion of the Rule is unnecessary as we decide the Confrontation Clause issue and affirm the Superior Court's judgment on other grounds. See Commonwealth v. Poplawski , 634 Pa. 517, 130 A.3d 697, 729 (2015) (issue waived on appeal in absence of contemporaneous, specific objection at trial); see also Robinson Twp. v. Commonwealth , 623 Pa. 564, 83 A.3d 901, 987 (2013) (constitutional claim presents question of law over which Court's review is plenary and de novo ; this Court not constrained by intermediate court's reasoning but may affirm on any grounds if judgment supported by record).[13]
Accordingly, we determine the factual scenario here differs from the factual scenario present in Bullcoming where the substitute analyst who testified at trial had no independent opinion regarding the defendant's BAC. Here Dr. Chu formed an independent conclusion and testified to that conclusion based on his own review of both the otherwise inadmissible facts and data contained in the report and the data provided by the autopsy photographs. Because Dr. Chu properly formed an independent opinion, and was available to be cross-examined regarding the basis of that opinion, we conclude there was no Confrontation Clause violation with respect to his opinion regarding the cause of death. Additionally, Dr. Chu's testimony was sufficient to satisfy the Commonwealth's evidentiary burden regarding the victim's cause of death.
The Superior Court, however, also determined to the extent Dr. Chu acted as a surrogate for Dr. Osbourne and expressed Dr. Osbourne's opinion regarding the cause of death, Dr. Chu's testimony was similar to the surrogate testimony rejected by the Court in Bullcoming as violating the Confrontation Clause. Brown , 139 A.3d at 219-20 n.20. Specifically, the jury heard, through Dr. Chu, that Dr. Osbourne had also concluded the victim's cause of death was four gunshot wounds. We determine any error that arose from Dr. Chu's testimony revealing Dr. Osbourne's opinion as contained in the report was harmless beyond a reasonable doubt because Dr. Chu's independent opinion testimony satisfied the Confrontation Clause and the Commonwealth's *333 evidentiary burden of proof. See Young , 748 A.2d at 193 (error harmless where erroneously admitted evidence merely cumulative of other untainted evidence substantially similar to erroneously admitted evidence).[14]
VI. Conclusion
We hold Dr. Osbourne's autopsy report, which concluded the victim died from multiple gunshot wounds, was testimonial in nature, and its admission into evidence without Dr. Osbourne's testimony, and in the absence of any prior opportunity to cross-examine Dr. Osbourne, violated Brown's constitutional right to confront the witnesses against him. However, we also hold the error was harmless. The autopsy report did not prejudice Brown, as the report was cumulative of properly admitted independent opinion testimony regarding the cause of death offered by Dr. Chu. Dr. Chu, an expert pathologist who testified at trial, did not participate in the victim's autopsy, but pursuant to his review of the inadmissible autopsy report and properly admissible autopsy photos, expressed his independent expert opinion the cause of death was multiple gunshot wounds. This was permissible under the Confrontation Clause. We note our ruling regarding the basis for an expert's independent opinion is fact-dependent. Each case involving this particular challenge to the Confrontation Clause must be based on its unique circumstances, as different facts regarding the nature of the opinion offered and the type of data relied upon by the testifying witness could result in a finding of prohibited surrogacy.
Order affirmed.
Justices Baer and Todd join the opinion in full.
Chief Justice Saylor and Justices Donohue, Wecht, and Mundy join Sections I through IV(A) of the opinion.
Justice Donohue files a concurring opinion, joined by Chief Justice Saylor and Justice Wecht.
Justice Mundy files a concurring opinion.
CONCURRING OPINION
JUSTICE DONOHUE
I join the Majority's holding in Section IV(A) that the autopsy report prepared by Dr. Marlon Osbourne was testimonial and that its admission into evidence was a violation of Brown's right to confrontation guaranteed to him by the Sixth Amendment to the United States Constitution. I further agree with the conclusion in Section IV(B) that this error was harmless beyond a reasonable doubt. I part ways, however, with respect to the plurality's *334 determination, in Sections IV(B) and V, regarding the admissibility of the "independent opinion" of Dr. Albert Chu, in connection with which he recited portions of Dr. Osbourne's autopsy report to the jury. In my view, permitting Dr. Chu to so testify was error, as it permitted the Commonwealth to do indirectly what it could not do directly, namely, to advise the jury of the findings and opinions of Dr. Osborne without providing Brown with an opportunity to cross-examine him. The introduction of testimonial forensic evidence without cross-examination of the analyst who performed the work is a clear violation of the confrontation rights of the accused, and I cannot join in the plurality's decision to ignore this basic constitutional principle.
In Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that when the prosecution seeks to introduce testimonial statements to prove a fact at issue in the criminal proceedings, the Confrontation Clause guarantees the defendant the opportunity to cross-examine the person who made those statements. Id. at 59, 124 S.Ct. 1354. According to the Court, the Confrontation Clause prohibits the prosecution from admitting "testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant ... had a prior opportunity for cross-examination." Id. at 53-54, 124 S.Ct. 1354. This guarantee applies equally to live testimony and to testimonial reports created to establish specific aspects of past events that are potentially relevant to a later criminal prosecution. See Commonwealth v. Yohe , 621 Pa. 527, 79 A.3d 520, 531 & n.11 (2013).
Five years later, in Melendez-Diaz v. Massachusetts , 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court made clear that Crawford applies to forensic evidence. Overturning a decision to permit the introduction of a forensic report identifying a substance seized from the defendant as cocaine, the Court rejected the notion that "neutral scientific testing" was presumptively reliable, indicating instead that forensic evidence is not "uniquely immune" from manipulation and mistake. Id. at 318, 129 S.Ct. 2527. Instead, citing to Crawford , the Court insisted that the reliability of forensic testing must be assessed in a particular manner-through "testing in the crucible of cross-examination." Id. at 317, 129 S.Ct. 2527 (quoting Crawford , 541 U.S. at 61, 124 S.Ct. 1354 ). As a result, the Court held that any time the prosecution seeks to introduce a testimonial forensic report, the defendant must be afforded the right to cross-examine the analyst who performed the work and prepared the report. Id. at 319, 129 S.Ct. 2527.
Echoing its decision in Melendez-Diaz and rejecting efforts to avoid its requirements, in Bullcoming v. New Mexico , 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Court refused to permit testimony by a "surrogate analyst"-a substitute expert who did not author the report or conduct any of the testing/analysis involved-as the means for introducing forensic evidence at a criminal trial. The prosecution attempted to introduce a laboratory report documenting the defendant's blood alcohol level through someone who worked at the laboratory but did not perform the blood tests or sign the report. Id. at 651, 131 S.Ct. 2705. Because the forensic report in question was testimonial, i.e., it was designed to "prov[e] some fact' in a criminal proceeding," id. at 662, 131 S.Ct. 2705 (quoting Melendez-Diaz , 557 U.S., at 310, 129 S.Ct. 2527 ), the Supreme Court held that Melendez-Diaz requires that the analyst who performed the testing and prepared and signed the report be made available for cross-examination. Id. at 661-62, 131 S.Ct. 2705. A surrogate analyst *335 cannot suffice for Confrontation Clause purposes, as only cross-examination of the "particular scientist" who did the work provides the defendant with the necessary opportunity to uncover any incompetence or dishonesty in the preparation of a forensic report through rigorous cross-examination. Id. at 652, 131 S.Ct. 2705.
In the present case, pursuant to the dictates of Crawford , Melendez-Diaz and Bullcoming , Dr. Chu clearly should not have been permitted, in Dr. Osborne's absence, to testify regarding the contents of Dr. Osborne's testimonial autopsy report. Dr. Chu did not participate in, assist with or observe the autopsy performed by Dr. Osborne. The plurality takes no constitutional issue with the trial court's decision to allow Dr. Chu to convey to the jury the results of Dr. Osbourne's work, including the location of the bullet wounds, the trajectory of the bullets through the victims' body, the nature of the wounds (perforating versus penetrating), and the distance from which the victim was shot.[1] Op. at 331; N.T., 11/5/2014, at 124-28. Instead, it insists that Dr. Chu testified only in "partial reliance on Dr. Osbourne's findings," and that his review of the autopsy photographs, which are not testimonial, "assisted him in evaluating Dr. Osbourne's findings[ ] and permitted Dr. Chu to arrive at an independent opinion regarding the cause," and that Dr. Chu relied on "the data provided by the autopsy photographs" in forming his opinion. Op. at 331 n.11, 332. In so finding, the plurality assumes, without explication, that the photographs alone depicted "non-hearsay facts upon which Dr. Chu could rely to form an independent opinion regarding the cause of death." Id . at 331 n.11. Respectfully, the record does not support this conclusion.
Dr. Chu testified that he "reviewed the autopsy photographs" when preparing to testify. N.T., 11/5/2014, at 123. Neither he nor any other witness testified regarding what the photographs depicted, let alone how, if at all, they factored into Dr. Chu's "independent opinion" as to the cause of the victim's death. The Commonwealth did not present the photographs at trial or seek their admission into evidence. Dr. Chu's testimony, summarized hereinabove, was given in direct response to questions posed to him about the contents of the autopsy report-he never mentioned his review of the photographs during the substance of his testimony or in relation to his "independent opinion." His testimony relied on, and vouched for, the accuracy of Dr. Osbourne's testing and analysis in the autopsy report. Dr. Chu presented no other basis in support of his "independent opinion" regarding the cause of the victim's death. Id. at 130. Because Brown had no opportunity to cross-examine Dr. Osborne, Dr. Chu's testimony plainly violated Brown's rights under the Confrontation Clause.
As the Supreme Court stated in Crawford , the Confrontation Clause "is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Crawford , 541 U.S. at 61, 124 S.Ct. 1354. By permitting the introduction of Dr. Chu's testimony without affording Brown an opportunity to cross-examine Dr. Osborne, the plurality does not recognize this basic procedural guarantee.
*336 This Court has routinely respected the guarantee. In Yohe , for example, there were several analysts in the same lab who participated in the testing of the defendant's blood for its alcohol concentration. This Court concluded that to satisfy the Confrontation Clause, Dr. Blum, the lab supervisor, was the expert required to testify at the defendant's trial for driving under the influence of alcohol. Yohe , 79 A.3d at 540. As this Court explained, Dr. Blum was the analyst that "engaged in the critical comparative analysis of the results of the gas chromatograph tests and the enzymatic assay," utilizing the raw data to determine the defendant's blood alcohol content, and authored the report detailing his opinion. Id. Further, Dr. Blum was able to testify as to the laboratory procedures and could speak to any deviations from the established protocols or any concerns about the technicians who participated in the testing process. Id. Because Dr. Blum was directly involved in the testing process and authored the testimonial report at issue, his testimony at the defendant's trial satisfied the defendant's confrontation rights.
In Commonwealth v. Ali , 608 Pa. 71, 10 A.3d 282 (2010), this Court held that the defendant's confrontation rights were satisfied by the testimony of a medical examiner who did not author the autopsy report. In that case, however, the testifying expert had supervised the autopsy in question, testified to his own observations of the body and other materials (slides and documents) from the examination, discussed the case with the physician that performed the autopsy, and reached his own independent opinions and conclusions regarding the cause of the victim's death. Id. at 305-07.
In significant contrast, in the case at bar, Dr. Chu did not participate in the autopsy, had no supervisory role and did not conduct any independent testing. Id. at 129. Dr. Chu conducted no independent assessment of the body or of the raw material available, if any, to reach his conclusion. Instead, Dr. Chu parroted the findings and analysis contained in Dr. Osbourne's report, and he provided his opinion in reliance thereupon that the victim died as a result of multiple gunshot wounds. That Dr. Chu was available for cross-examination regarding his conclusion as to cause of death is of no constitutional moment, as Brown could not cross-examine him on the inadmissible facts and analysis that formed the basis of his opinion. I therefore disagree with the plurality that Dr. Chu reached an "independent opinion" regarding the cause of death. The Confrontation Clause barred the testimony of Dr. Chu because the testimony was a wholesale recitation of the inadmissible testimonial autopsy report.
The plurality declines to address the Superior Court's reliance, in its decision below, on Pennsylvania Rule of Evidence 703 to find that Dr. Chu's testimony was admissible. Op. at 331-32; see Commonwealth v. Brown , 139 A.3d 208, 218-19 (Pa. Super. 2016).[2] As this was the second issue *337 upon which this Court granted allowance of appeal, Commonwealth v. Brown , 640 Pa. 533, 164 A.3d 461 (2016) (per curiam), and because, in my view, the Superior Court's reliance on Rule 703 was erroneous, I regard this as an important issue for this Court to address.
Rule 703 states:
An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.
Pa.R.E. 703. In Crawford , the Supreme Court held that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford , 541 U.S. at 59, 124 S.Ct. 1354. As five justices on the United States Supreme Court made clear in Williams v. Illinois , 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), however, state evidentiary rules do not provide a basis for evading and ignoring the requirements of Crawford , Melendez-Diaz and Bullcoming with respect to the introduction of testimonial evidence. In Williams , a rape prosecution, the Court addressed whether the Confrontation Clause barred testimony by a prosecution expert who, in reaching her conclusion that the defendant's DNA profile matched the DNA recovered from a vaginal swab of the victim, relied on a DNA report created by an analyst at an independent lab (Cellmark). The prosecution expert described the contents of the Cellmark DNA report to the jury to support her conclusion that Cellmark's testing of the vaginal swabs produced a male DNA profile that implicated the defendant. The Cellmark analyst who prepared the DNA report did not testify and thus could not be cross-examined.
The case resulted in a fractured decision with no majority rationale. Four Justices (Justice Alito, joined by Chief Justice Roberts and Justices Kennedy and Breyer) were of the view that the Confrontation Clause did not apply because the expert did not testify to the truth of the facts and *338 analysis contained in the Cellmark report or "vouch for the quality" of the work. Id. at 70-71, 132 S.Ct. 2221 (plurality). Alternatively, if offered for its truth, the plurality found that the Cellmark report was not testimonial because it "was not prepared for the primary purpose of accusing a targeted individual ... or to create evidence for use at trial." Id. at 84, 132 S.Ct. 2221. Justice Thomas concurred in the judgment, as he agreed with the plurality that the Cellmark report was not testimonial, though he did so for different reasons. Id. at 103-04, 132 S.Ct. 2221 (Thomas, J., concurring) (stating that the report "lacked the requisite 'formality and solemnity' to be considered 'testimonial").
Justice Kagan, joined by Justices Scalia, Ginsburg and Sotomayor, dissented, insisting that the Cellmark report was testimonial and thus, pursuant to the dictates of Crawford , Melendez-Diaz and Bullcoming , its contents should not have been disclosed to the jury "except by calling to the stand the person who prepared it." Id. at 128, 132 S.Ct. 2221 (Kagan, J., dissenting). According to Justice Kagan, in reciting Cellmark's testing and findings to the jury, the prosecution expert became a mere conduit for inadmissible testimonial evidence, a procedure the Court had just rejected in Bullcoming .[3] Id. at 129, 132 S.Ct. 2221 ("By testifying in that manner, [the prosecution expert] became just like the surrogate witness in Bullcoming - a person knowing nothing about 'the particular test and testing process,' but vouching for them regardless.").
Justice Kagan offered two sound reasons in support of this position. First, when out-of-court forensic testing is disclosed as the basis for an expert's conclusion, the out-of-court statement is, of necessity, introduced for its truth. Justice Kagan explained:
If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such "basis evidence" comes in not for its truth, but only to help the factfinder evaluate an expert's opinion "very weak," "factually implausible," "nonsense," and "sheer fiction." D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence § 4.10.1, pp. 196-197 (2d ed.2011); id. , § 4.11.6, at 24 (Supp.2012). "One can sympathize," notes that treatise, "with a court's desire to permit the disclosure of basis evidence that is quite probably reliable, such as a routine analysis of a drug, but to pretend that it is not being introduced for the truth of its contents strains credibility." Id., § 4.10.1, at 198 (2d ed.2011); see also, e.g., People v. Goldstein , 6 N.Y.3d 119, 128, 810 N.Y.S.2d 100, 843 N.E.2d 727, 732-733 (2005) ("The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful").
Id. at 127, 132 S.Ct. 2221. According to Justice Kagan, rather than constituting a non-hearsay basis for the introduction of *339 testimonial evidence, "admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it except assess its truth and so the credibility of the conclusion it serves to buttress." Id. (emphasis in original).
Second, because forensic evidence is being offered for its truth, the "not-for-the-truth rationale is a simple abdication to state-law labels." Id. at 132, 132 S.Ct. 2221. In this regard, state rules of evidence "do not define federal constitutional requirements." Id. In Crawford , the Court indicated that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence[.]" Crawford , 541 U.S. at 61, 124 S.Ct. 1354. Justice Kagan recognized that Crawford "made clear that the Confrontation Clause's protections are not coterminous with rules of evidence." Williams , 567 U.S. at 132, 132 S.Ct. 2221. Moreover, the use of state evidentiary rules to introduce testimonial evidence without any opportunity for cross-examination, Justice Kagan emphasized, allows prosecutors "to do through subterfuge and indirection what we have previously held the Confrontation Clause prohibits." Id. at 132, 132 S.Ct. 2221.
Importantly, while Justice Thomas did not find the Cellmark report to be testimonial, he agreed entirely with Justice Kagan regarding the plurality's "not-for-the-truth" rationale. First, he did not find that introducing testimonial evidence to provide a basis for an expert's opinion constituted a "legitimate , nonhearsay purpose," id. at 105, 132 S.Ct. 2221 (emphasis in original), because it is being offered solely for its truth.
There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth. "To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true." D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.10.1, p. 196 (2d ed. 2011) ). "If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert's conclusions." Id.
Id. at 106, 132 S.Ct. 2221 (Thomas, J., concurring). Justice Thomas also agreed with Justice Kagan's view that evidentiary rules cannot trump federal constitutional confrontation rights. Id. at 105, 132 S.Ct. 2221 ("[W]e have recognized that concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules.").
Thus, in Williams five justices of the United States Supreme Court agreed that where a testifying expert relies upon a testimonial report that contains testing and analysis conducted by a non-testifying expert (in which the testifying expert did not participate or observe), the Confrontation Clause bars the expert from testifying to the statements contained in that report.[4]
*340 The prosecution cannot "rely on [the testifying witness'] status as an expert to circumvent the Confrontation Clause's requirements." Id. at 126, 132 S.Ct. 2221 (Kagan, J., dissenting) (citing id. at 106, 132 S.Ct. 2221 (Thomas, J., concurring) ). Pa.R.E. 703 cannot be used as an end-run around the Sixth Amendment right to confrontation. It therefore does not operate to permit Dr. Chu to offer an "independent opinion" based almost exclusively on Dr. Osborne's autopsy report and, in so doing, permit Dr. Chu to disclose to the jury the contents of that report to the jury.
Nonetheless, in the present case, because I agree that the error of admitting the autopsy report was harmless, it necessarily follows that the error of admitting Dr. Chu's testimony regarding statements contained in the autopsy report was harmless as well. The law is clear that the Commonwealth satisfies its burden of proving that the defendant caused the victim's death beyond a reasonable doubt by presenting evidence establishing that the "action of the defendant ... constitute[d] a direct and substantial factor in causing the death of the victim." Commonwealth v. Johnson , 445 Pa. 276, 284 A.2d 734, 735 (1971). This Court has held, however, that medical testimony is not required to establish causation in a murder prosecution. Commonwealth v. Ilgenfritz , 466 Pa. 345, 353 A.2d 387, 390 (1976) ("While it is true, of course, that the Commonwealth must prove causation, like every element of a crime, beyond a reasonable doubt, it does not follow that only medical testimony can prove causation, or that any medical testimony which is relied upon by the Commonwealth must be framed specifically in terms of the beyond a reasonable doubt standard."); Commonwealth v. Gilman , 485 Pa. 145, 401 A.2d 335, 339 (1979) (plurality) ("medical testimony is not required to prove the cause of death"). Rather, the evidence-direct or circumstantial-must be such that they jury could "justifiably conclude" that the defendant's action caused the victim's death beyond a reasonable doubt. Ilgenfritz , 353 A.2d at 389.
The record reflects that several witnesses testified to hearing and/or seeing Brown shoot the victim multiple times, and afterwards, observing the victim laying on the ground. N.T., 11/4/2014, at 86, 88, 122; N.T., 11/5/2014, at 13, 17, 27, 70. Further, according to the testimony of Philadelphia Police Officer Jonathan Mangual, the victim was unresponsive when he arrived at the scene following the shooting, was bleeding from multiple gunshot wounds, and he was pronounced dead at the hospital approximately twenty minutes after the shooting occurred. N.T., 11/4/2014, at 32-36. There was no evidence presented at trial that the victim died of any cause other than the gunshot wounds he sustained.[5] Brown's defense did not involve challenging the cause of the victim's death in any respect.
As stated hereinabove, the autopsy report and Dr. Chu's testimony in reliance thereupon established that the cause of the victim's death was multiple gunshot wounds. In the absence of the autopsy report and Dr. Chu's testimony, however, there was competent evidence presented at trial to allow a jury to justifiably conclude, beyond a reasonable doubt, that the victim died as a result of the gunshot wounds. Moreover, Brown's defense was not that *341 the victim died of something other than the multiple gunshot wounds he sustained on the night in question, but that Brown was not the perpetrator of the murder. See, e.g., N.T., 11/6/2014, at 19-20 (in his summation at trial, counsel for Brown acknowledged that gunshots "were definitely fired," but he argued to the jury that the question is, "by whom"). Neither the autopsy report nor Dr. Chu's testimony provided any information regarding the identity of the shooter. Thus, the errors of admitting the autopsy report and Dr. Chu's testimony did not prejudice Brown, or if they did prejudice him, the prejudice he suffered was de minimus. See Commonwealth v. Young , 561 Pa. 34, 748 A.2d 166, 193 (1999). As "it is clear that [these errors] did not contribute to the verdict," they were harmless. Commonwealth v. Mitchell , 576 Pa. 258, 839 A.2d 202, 214 (2003). I therefore concur in the conclusion that Dr. Chu's testimony does not entitle Brown to a new trial.
Chief Justice Saylor and Justice Wecht join this concurring opinion.
CONCURRING OPINION
JUSTICE MUNDY
I join the Majority insofar that it concludes Dr. Osbourne's autopsy report was testimonial and its admission as substantive evidence violated Brown's Sixth Amendment right to confront the witnesses against him under Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). I further agree that the Crawford error was harmless. However, I write separately because my reasoning as to the harmless error doctrine differs from the OAJC's.
As Justice Donohue points out, several non-expert witnesses testified at trial that they saw or heard gunshots. See Concurring Op. of Donohue, J., at 340. Sakina Warren testified that she was at Shana Shockley's home on the night in question when she heard gunshots. N.T., 11/4/14, at 86. Warren went outside and saw the victim walking and then collapse on the ground. Id. at 87. Antwaine Williams testified that he was outside with Brown and the victim and he personally witnessed Brown shoot the victim. Id. at 122. Philadelphia Police Officer Jonathan Mangual testified that when he arrived at the scene, the victim was lying face down, was unresponsive, and was bleeding from a hole in the center of his chest. Id. at 32-33. Shockley testified to hearing gunshots, looking out the window and seeing the victim laying on the ground. N.T., 11/5/14, at 8. Tameka McNair, Shockley's neighbor, provided the same account. Id. at 55. Damon Swain, the victim's cousin, testified that he was with Shockley in her home when he heard the gunshots, looked out the window and saw Brown standing behind the victim still pointing a gun at the victim's back. Id. at 64, 67-68. Swain stated that he observed the victim "dropping on the ground." Id. at 68. Moreover, as Justice Donohue points out, at trial, Brown's defense did not focus on challenging the cause or manner of death at all. Concurring Opinion of Donohue, J. at 340-41.
In my view, if the jurors believed these witnesses, they were permitted to use their common sense to infer from this testimony that the victim died from a homicide as a result of gunshot wounds. Cf. Commonwealth v. Walker , 625 Pa. 450, 92 A.3d 766, 780 (2014) (stating, "to be admissible, the expert testimony must be beyond the knowledge possessed by a layperson and assist the trier of fact to understand the evidence or determine a fact in issue"). In short, I agree with Justice Donohue to the extent she concludes that because the jurors could make these inferences on their own from other uncontradicted witness testimony, the admission of Dr. Osbourne's report did not cause Brown any prejudice.
*342 However, I would end the analysis at that point because Dr. Chu's testimony as to cause and manner of death was not prejudicial for the same reason. Since the jurors could infer the cause and manner of death from the eyewitness testimony of laypersons, expert testimony was not required.[1] Because it is established that any prejudice to Brown arising from the critical evidence in Dr. Osbourne's report and Dr. Chu's testimony was de minimis, I would not express any further opinion on the harmless error question presented in Brown's appeal. See OAJC at 329-33.
Based on the foregoing, I agree with the Majority that Brown's Confrontation Clause rights were violated by the admission of Dr. Osbourne's report. I further agree that the Crawford error in this case was harmless, but only because the autopsy report and its accompanying testimony did not affect the outcome of Brown's trial in light of other non-expert witness testimony as to the cause and manner of death. Accordingly, I respectfully concur in the result only.

The report stated the paths of the two bullets entering the victim's chest were right to left, front to back and downward, the path of the bullet entering the victim's shoulder was front to back and slightly downward, and the path of the bullet entering the victim's back was right to left, back to front and upward.

Co-defendant's counsel objected "[o]n the basis of the United States Supreme Court case whose name I always forget from four or five years ago, long German name, unless the second expert participated in the examination or the findings of the first expert, then according to that case, he is barred from testifying, and that's the objection I would make unless on his preliminary testimony he says not only did I look [the autopsy report] over, but I assisted or whatever. But if he just looked it over and he is testifying from the other man's conclusion, then I would move that it be barred." N.T., 11/5/14, at 100-01. Brown's counsel joined in the objection. Bullcoming , discussed in more detail infra , prohibits the prosecution from introducing into evidence a forensic lab report containing a "testimonial" certification through the "surrogate" in-court testimony of an analyst who had not signed the certification or performed or observed the test reported in the certification. 564 U.S. at 652, 131 S.Ct. 2705.

In pertinent part, the Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. amend. VI. The right to confrontation "applies to witnesses against the accused-in other words, those who bear testimony. Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford v. Washington , 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (internal quotations, citation, and brackets omitted). Forensic or scientific reports can be functionally identical to live in-court testimony, accomplishing precisely what a witness does on direct examination. Melendez-Diaz v. Massachusetts , 557 U.S. 305, 310-11, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Such a report is "testimonial" if its primary purpose is to establish or prove past events potentially relevant to a later criminal prosecution. Commonwealth v. Yohe , 621 Pa. 527, 79 A.3d 520, 531 (2013), citing Davis v. Washington , 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). A report has this primary purpose if it is created or prepared under circumstances which would lead an objective witness reasonably to believe the report would be available for use at a later trial. Id. , 79 A.3d at 531 n.11, citing Crawford , 541 U.S. at 51-52, 124 S.Ct. 1354. A "testimonial report" is inadmissible absent a showing the analyst was unavailable to testify and the defendant had a prior opportunity to cross-examine the analyst. Melendez-Diaz , 557 U.S. at 311, 129 S.Ct. 2527, citing Crawford , 541 U.S. at 54, 124 S.Ct. 1354. Thus, under Bullcoming , the Sixth Amendment precludes the admission of a testimonial lab report through "surrogate" in-court testimony only. Bullcoming , 564 U.S. at 652, 131 S.Ct. 2705.

Pennsylvania Rule of Evidence 703 provides:
An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.
Pa.R.E. 703.

The Commonwealth's appeal is docketed at 40 EAP 2016, and Brown's appeal is docketed at 41 EAP 2016.
The Commonwealth presents one question: "Did the Superior Court err when it rejected binding Confrontation Clause authority and held as a matter of first impression that autopsy reports are testimonial?" Commonwealth's Brief at 10.
Brown presents two questions: "I. Because an autopsy report constitutes testimonial hearsay, does use of that report by another expert as the basis for his own opinion violate the Sixth Amendment guarantee of the right of Confrontation? II. Because Rule 703 allows an expert to use inadmissible evidence to form an opinion but does not allow that inadmissible evidence to be used for its truth, did not the Superior Court err in concluding that Rule 703 permitted the testimony in this case where the testifying expert's opinion has relevance and probative value only if the report he relied on is true?" Brown's Brief at 4 (emphasis in original).

The Philadelphia County Code transfers all duties performed by the Coroner to the Office of the Medical Examiner. Philadelphia Code § 2-102(2)-(4).

Williams resulted in four opinions, none of which garnered a majority for its legal rationale; the various expressions are discussed infra .

The Comment to Pennsylvania Rule of Evidence 703 explains the Rule differs somewhat from its federal counterpart:
This rule is identical to the first two sentences of F.R.E. 703. It does not include the third sentence of the Federal Rule that provides that the facts and data that are the bases for the expert's opinion are not admissible unless their probative value substantially outweighs their prejudicial effect. This is inconsistent with Pennsylvania law which requires that the facts and data that are the bases for the expert's opinion must be disclosed to the trier of fact. See Pa.R.E. 705 [ ("If an expert states an opinion the expert must state the facts or data on which the opinion is based.") ]
Cmnt. to Pa.R.E. 703. The Comment to Pennsylvania Rule of Evidence 705 further explains "[w]hen an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible, the trial judge upon request must, or on the judge's own initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence." Cmnt. to Pa.R.E. 705.

Justice Thomas authored a concurrence which agreed the lab report was non-testimonial and thus beyond the reach of the Confrontation Clause, but on a rationale other than that offered by the plurality. In Justice Thomas's view, the lab report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." Williams , 567 U.S. at 104, 132 S.Ct. 2221 (Thomas, J., concurring) (citations omitted). No other Justice joined the concurrence.

We disagree with the Commonwealth's assertion the report was non-testimonial because it did not identify anyone as a perpetrator of a crime. This argument is based on the plurality decision in Williams which concluded for a statement to be testimonial it must inculpate a particular individual. As noted above, the OAJC view in Williams did not garner a majority and is not precedential.

Justice Donohue questions the "independent" nature of Dr. Chu's opinion, asserting his testimony was based almost exclusively on the accuracy of Dr. Osbourne's testing and analysis. Op. at 335-36 (Donohue, J. Concurring). Justice Donohue concurrently questions the pertinence of the photos to inform Dr. Chu's opinion because there was no testimony to establish "how, if at all, they [the photos] factored into Dr. Chu's 'independent testimony' as to the cause of the victim's death." Op. at 335 (Donohue, J. Concurring). Given Dr. Chu's unimpeached testimony he utilized the photos to aid his conclusion the victim sustained four gunshot wounds that caused his death, any weakness in that testimony was certainly ground for cross-examination. In any event, we plainly acknowledge Dr. Chu's partial reliance on Dr. Osbourne's findings. We stress that Dr. Chu reviewed contemporaneous photos of the autopsy, which assisted him in evaluating Dr. Osbourne's findings, and permitted Dr. Chu to arrive at an independent opinion regarding the cause of death. While other additional and more comprehensive methods of contemporaneous recording of the autopsy procedure were not employed in this instance (such as video and/or audio), we cannot conclude the photos provided insufficient non-hearsay facts upon which Dr. Chu could rely to form an independent opinion regarding the cause of death.

For example, Dr. Chu was asked his opinion regarding, among other things, whether the wounds to the victim, as set forth in the autopsy report, would have caused instantaneous death. Dr. Chu testified death would have been rapid but not instantaneous, and the injuries would be consistent with a scenario in which the victim walked a few feet before collapsing. N.T. 11/5/14, at 128.

Justice Donohue contends we improperly decline to discuss the applicability of Rule 703 and disagrees Brown waived any claims relating to Rule 703. Op. at 336, n.2 (Donohue, J. Concurring). Moreover, Justice Donohue opines we fail to explain our position pointing out Rule 703 might apply (in conjunction with application of Rule 705, see n.8, supra ) had the autopsy report not been introduced. Here, the inadmissible autopsy report was admitted into evidence, and we stress our holding that Dr. Chu could properly offer an independent opinion is based not on Rule 703, but on our analysis of relevant Confrontation Clause jurisprudence which, as explained supra , permitted Dr. Chu to form an independent opinion based on his review of admissible facts that supplemented the autopsy report. Moreover, the parties and the trial court did not raise or address the potential applicability of Rule 703 below. The potential applicability of Rule 703 was discussed in the first instance by the Superior Court sua sponte , which resulted in discussion of the issue for the first time by Brown in this appeal. Because we decide the matter on other preserved grounds, we decline to conduct a merits analysis of the issue challenging the applicability of Rule 703.

Justice Donohue and Justice Mundy would conclude the error was harmless based on eyewitness testimony establishing the victim was shot several times before he died. Op. at 340-41 (Donohue, J. Concurring), Op. at 342, (Mundy, J. Concurring), citing Commonwealth v. Ilgenfritz , 466 Pa. 345, 353 A.2d 387 (1976), Commonwealth v. Gilman , 485 Pa. 145, 401 A.2d 335 (1979) (plurality), and Commonwealth v. Vandivner , 599 Pa. 617, 962 A.2d 1170 (2009). However, none of those cases raised a Confrontation Clause issue; in each case the medical examiner who performed the autopsy testified at trial and all three cases concerned not the admissibility of the medical examiner's testimony, but whether the examiner's testimony sufficiently established the cause of death to a reasonable degree of medical certainty. We have great hesitation equating an eyewitness's lay testimony observing a victim was shot with expert medical testimony stating the cause of death, even in cases where the cause of death appears obvious. In any event, here, there is no need to rely on the testimony of lay witnesses because Dr. Chu's independent expert testimony was sufficient to prove the victim's cause of death.

Dr. Chu also testified to the opinion reached by Dr. Osbourne in his autopsy report. N.T., 11/5/2014, at 130. The Majority recognizes that this aspect of Dr. Chu's testimony was inadmissible on confrontation grounds. Op. at 332.

Although the plurality states that it is not deciding whether Rule 703 permitted Dr. Chu's testimony in reliance on the autopsy report, it nonetheless also states, "[H]ad the autopsy report not been introduced into evidence at trial, Pa.R.E. 703 would arguably permit precisely the type of expert opinion testimony given by Dr. Chu, which was based in part on the otherwise inadmissible facts and data contained in the report upon which experts in the field of forensic pathology would reasonably rely in forming an opinion." Op. at 331-32 (emphasis omitted). The plurality does not explain these inconsistent positions.
The plurality further contends that Brown waived any claims related to Rule 703. Id. at 332 ("we decline to decide Brown's Rule 703 -based claims challenging the admissibility of Dr. Chu's testimony because, as the Commonwealth correctly points out, Brown never relied on Rule 703 as a basis for his objections to Dr. Chu's testimony or to the admissibility of the autopsy report as trial"). This is a misstatement of the burdens related to Rule 703. As the party seeking to introduce Dr. Chu's expert testimony, it was for the Commonwealth, not Brown, to assert Rule 703 as a basis for doing so. At trial, in response to Brown's objection on constitutional grounds, the Commonwealth did not raise Rule 703 as a basis for admission. In response to the Superior Court's sua sponte injection of Rule 703 into its analysis, and the Commonwealth's subsequent argument before this Court in support of that analysis, Brown argues that his Sixth Amendment right to confrontation trumps any application of Rule 703. See, e.g. , Brown's Brief at 18 ("Where that inadmissible information is testimonial hearsay, however, [Rule] 703 must bow to the right of Confrontation, because the only way the in-court testimony has relevance is if the information relied upon is true-and that reliance consequently "back doors" testimonial hearsay, a violation of the Sixth Amendment."); Brown's Reply Brief at 10 ("Brown is not raising Rule 703 but is raising the Sixth Amendment-his analysis has been and is that his right of Confrontation was violated, and that the Superior Court's application of Rule 703 does not cure the Constitutional defect."). Brown has not waived any claims relating to Rule 703 because he has no affirmative claims to make based on Rule 703. Brown has consistently asserted, from the time of trial to the present, that the content of Dr. Osborne's autopsy report was inadmissible (either directly or indirectly through Dr. Chu's testimony) because permitting its presentation to the jury, in the absence of an opportunity to cross-examine Dr. Osborne, violated his constitutional rights under the Confrontation Clause. See N.T., 11/5/2014, at 101.

In the present case, the Majority observes that in Bullcoming , Justice Sotomayor authored a concurring opinion in which she questioned whether the Confrontation Clause would bar testimony by an expert witness who provided an "independent opinion about underlying testimonial reports that were not themselves admitted into evidence." Op. at 326-27 (quoting Bullcoming , 564 U.S. at 673, 131 S.Ct. 2705 (Sotomayor, J., concurring) ). When faced with this very question in Williams , however, Justice Sotomayor joined Justice Kagan in finding that such testimony violates a defendant's confrontation rights.

Courts in other jurisdictions have likewise recognized this interpretation of the Confrontation Clause. See, e.g. , People v. John , 27 N.Y.3d 294, 33 N.Y.S.3d 88, 52 N.E.3d 1114, 1128 (2016) ; People v. Sanchez , 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320, 333 (2016) ; State v. Stanfield , 158 Idaho 327, 347 P.3d 175, 187 (2015) ; State v. Navarette , 294 P.3d 435, 436 (N.M. 2013) ; Martin v. State , 60 A.3d 1100, 1108-09 (Del. 2013) ; State v. Medicine Eagle , 835 N.W.2d 886, 898-99 (S.D. 2013) ; Young v. United States , 63 A.3d 1033, 1048 (D.C. 2013) ; Rosario v. State , 175 So.3d 843, 861-62 (Fla. Dist. Ct. App. 2015).

To establish that the defendant's actions caused the victim's death, this Court has also held that "the Commonwealth is not required to prove that a merely hypothetical supervening event did not take place." Commonwealth v. Green , 477 Pa. 170, 383 A.2d 877, 879 (1978) (citing Commonwealth v. Williams , 450 Pa. 158, 299 A.2d 643 (1973) ).

The Superior Court premised its harmless error analysis on its separate conclusion that under Pennsylvania law, "in order to prove all the elements of third-degree murder, inter alia, that Morton's death was caused by gunshot wounds, expert testimony was required." Commonwealth v. Brown , 139 A.3d 208, 217 (Pa. Super. 2016), appeal granted , 640 Pa.533, 164 A.3d 461 (2016). However, as Justice Donohue points out, this is not true, because this Court explicitly held "medical testimony is not required to prove the cause of death" and we have held the same for manner of death. See Commonwealth v. Gilman , 485 Pa. 145, 401 A.2d 335, 339 (1979) (plurality); see also Commonwealth v. Ilgenfritz , 466 Pa. 345, 353 A.2d 387, 390 (1976) (stating, "[w]hile it is true, of course, that the Commonwealth must prove causation, like every element of a crime, beyond a reasonable doubt, it does not follow that only medical testimony can prove causation."); Commonwealth v. Vandivner , 599 Pa. 617, 962 A.2d 1170, 1180 (2009) (concluding any potential evidentiary error as to expert testimony about manner of death was harmless in part due to "[f]our eyewitnesses testified to having seen [the defendant] shoot [the victim] in the head."), cert. denied , 559 U.S. 1038, 130 S.Ct. 2060, 176 L.Ed.2d 416 (2010). Therefore, the Superior Court's harmless error analysis was built on a false premise. Nevertheless, even within the harmless error doctrine, this Court is permitted to affirm on any legal grounds supported by the certified record. Commonwealth v. Fant , 637 Pa. 135, 146 A.3d 1254, 1265 n.13 (2016).